IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

WILLIAM D. KLAUS, JR.,

                                   Plaintiff,                    OPINION AND ORDER

          v.                                                     09-cv-479-wmc

EAU CLAIRE AREA SCHOOL DISTRICT,
c/o Dr. Ronald A. Heilmann, Jr. and Carol J. Craig,
CAROL J. CRAIG, MARY C. KNEER, BRENT M.
WOGAHN, PATRICIA M. CUMMINS, MICHAEL
A. BOLLINGER, KENNETH M. FAANES and
D. ADAM SHIEL,

                                   Defendants.

---

This lawsuit arises out of the inner working and politics of the Eau Claire Area School

District.  Plaintiff William D. Klaus, Jr. has been employed by the Eau Claire Area School

District since 1980.  He became superintendent of the District on July 1, 1998, and maintained

that position until July 16, 2007, when he was transferred to a position as middle school

principal at his request.  Klaus was placed on paid administrative leave in the spring of 2008

and then was suspended without salary, but with other employment benefits, from August 11,

2008, until June 15, 2009.  After the suspension, he was employed by the District as a director

of special projects for the 2009-2010 school year.  Plaintiff  asserts claims against defendants

sounding in due process under the Fourteenth Amendment and common law contract,

promissory estoppel and defamation.  The court has already determined that plaintiff's

simultaneous execution of two Administrator Contracts employing him as a middle school

principal effective for a period from 2007 to 2011 violated the two-year limit on administrator

employment contracts set forth in Wis. Stat. § 118.24(1) and entered summary judgment in

defendant's favor on plaintiff's breach of contract claim.  *See* dkt. #68.  Plaintiff's remaining

claims stem from defendants' decision to suspend him for the 2008 school year.  For the reasons given below, defendants' motion will be granted.

UNDISPUTED FACTS[1]

## I.   Overview of Klaus's Employment Contracts with the District

Klaus's first superintendent contract provided him with employment for a two-year term from July 1, 1998, until June 30, 2000, with the possibility of a one-year extension to cover the 2000-2001 school year unless the School Board notified him of its intent not to provide the extension by June 30, 1999.  Klaus and the Board entered into subsequent superintendent contracts on an annual or bi-annual basis.  Before entering into each subsequent contract, Klaus would consult with the District's director of personnel and the Board, make handwritten notations of changes to the contract, and provide the handwritten notations to his assistant, Patti Iverson, who was also the secretary for the Board and would type up the revised contracts.

Between Klaus's first superintendent contract and February 2003, he entered into only one contract with the District at a time.  Each contract provided for a two-year term of employment with the possibility of a one-year extension.  Then, on February 17, 2003, Klaus altered this practice, signing two consecutive contracts simultaneously to secure his superintendent position for the next four years.  The Board chose to execute two contracts together to provide Klaus with more long term job security after determining that they could

---

[1] The following essential facts, taken from the parties' proposed findings of fact, are material and undisputed for purposes of summary judgment.  In addition, the court incorporates, but will not repeat, all the facts provided in its decision on plaintiff's summary judgment motion.  Dkt. #68.

only provide minimal pay increases which were not in-line with what a superintendent would be paid in a comparable school district.

Every year for the next four years, Klaus and the Board executed two contracts on the same day, effectively giving Klaus a rolling guaranteed four-year contract.  In 2005, the two contracts were further changed so that the trigger on a one-year extension of the second contract essentially granting a fifth year of employment came six months into the term of the first, two-year contract, as opposed to having the trigger occur during the term of the second contract.

All of Klaus's employment contracts, including the last valid one making him a middle school principal entered into on February 5, 2007, contain the following language:

> 5.    <u>Board's Responsibilities and Rights</u>.  The Board reserves all management rights not abrogated by this agreement.  The rights of the Board include, but are not limited to, the following:
>
> . . .
>
> d.    To suspend, demote or take other disciplinary action, short of termination, against Administrator.  Discipline shall not be arbitrary or capricious and Administrator shall have the right to request a meeting before the full Board on the merits of the proposed discipline;
>
> . . .
>
> 7.    <u>Termination</u>.
>
> . . .
>
> b.    The Board may terminate this agreement and discharge Administrator during the term of this agreement for just cause. Administrator shall receive prior written notice of the charges. Administrator shall have an opportunity to request and have a fair and impartial hearing before the Board regarding those charges.

> Administrator shall have the right to prior written notice of the time and place of said hearing. Administrator shall have the right to demand that the hearing be held in open session. Administrator shall have right to present testimony and cross-examine those making charges against him/her. Administrator shall have the right to be represented by counsel of his/her choice at such hearing.

*See* Lubinsky Aff., dkt. #30, ex. 2.[2] Each contract also contains language about early retirement benefits. This language underwent changes over the years, though very little was changed between the contracts Klaus signed in 2006 and those he signed in 2007. The following is the language from the valid 2007 contract with language changed from the 2006 contract underlined:

> k.   The Board of Education shall provide the following early retirement benefits:
>
> > i.   An early retirement stipend will be paid to the Superintendent who elects to retire <u>(district retirement)</u> at or after the age of <u>53</u> who has a minimum of fifteen (15) years' experience within the Eau Claire Area School District. The Superintendent retiring after fifteen (15) years of local experience will receive an annual stipend of twenty-five percent (25%) of his/her compensation comprised of annuity and salary. For each additional year of experience beyond fifteen (15) years up to a maximum of twenty-five (25) years, the Superintendent retiring at or after the age of <u>53</u> will receive an additional one percent (1%) up to a total of thirty-five percent (35%). This stipend shall be paid as directed by the Superintendent within the district's retirement plan.

---

[2] Because of the idiosyncratic numbering inherent in the court's electronic filing system, the identification of specific documents can be confusing. The court cites the docket number, #30 using the example above, and the exhibit as it is labeled on the docket sheet, ex. 2, as opposed to citing the number or letter given the exhibit by the party submitting it, which in this instance was ex. B of dkt. #30. When a particular page in an exhibit is cited, the court uses the page number assigned by CM/ECF, because some exhibits contain multiple documents that are not consistently numbered.

. . .

> iii.    The Superintendent, upon reaching age <u>53</u> or beyond and completing fifteen (15) years in the Eau Claire Area School District, may assume another vacant administrative position in the district for which he holds certification. The Superintendent shall retain contractual retirement benefits of his current contract at the time of the position change. Retirement compensation will be based on the last contract year as Superintendent.

*See id.*[3]


## II.    <u>Klaus's Change in Administrative Position and the Early Retirement Stipend</u>

In December 2006, Klaus informed the Board that he wanted to step down as superintendent and work in a lower level administrative position. The following month, the Board had a closed session meeting to review Klaus's evaluation and to discuss possible changes to his contract. At the closed session on January 8th, the Board discussed changing the early retirement stipend for Klaus.

The accounts of what happened at that session vary. Some Board members recall agreeing to allow Klaus to access an early retirement stipend in the summer of 2007, as soon as he stepped down as superintendent and was transferred to a principalship but before he retired from being employed by the District. Others recall, as reflected in the meeting minutes,

---

[3]  Klaus's 2007 contract also provided that:
> At the February 5, 2007, School Board Meeting a transfer to a middle school principalship was approved. All current benefits stay in place for the duration of this contract. The salary starting July 16, 2007, will change to that of a middle school principal.

*See id.*

discussing a change in the age for the stipend to 53 and allowing Klaus to transfer to another administrative position.

A few weeks later, the Board held another closed session meeting at which Klaus discussed the terms of his new contract with the Board. This took place on January 22, 2007. After providing Jim Kling, the District's personnel director, with handwritten proposed changes to his contracts and discussing those changes with Kling, Klaus gave the changes to his secretary, Ms. Iverson, which she typed up. Klaus provided copies of the changed, proposed contracts to then Board President Carol Olson and then Board Clerk JoAnne Evans. While Klaus did not provide copies of his contracts to the other Board members, he brought copies to the February 5, 2007, meeting with the Board and made the contracts available for review. At that meeting, Klaus's contracts were approved by the Board by unanimous roll call. Klaus, Olson and Evans signed the contracts that same day.

Toward the end of the 2006-2007 school year, Klaus began discussing retirement benefits issues with Kling. Specifically, Klaus asked what his early retirement benefits would be upon accessing them in the upcoming 2007 summer and what had to be done to begin accessing his early retirement stipend that summer. Klaus wanted to begin receiving his early retirement stipend while still employed as a principal for the District, consistent with his position that in stepping down, he was "retiring" from the superintendent position and, thus, could access the stipend once he turned 53. Kling explained that he would feel more comfortable providing Klaus access to an early retirement stipend if there were a written statement confirming that Klaus was entitled to begin accessing the stipend. Klaus asked whether a statement from the former Board president, Ms. Olson, confirming her recollection

6

would provide him the necessary comfort and Kling said it would.

After meeting with Kling, Klaus directed his assistant, Ms. Iverson, to contact Ms. Olson to find out what she remembered about approving Klaus's early retirement stipend and to ask if she would be willing to provide a written document confirming what she remembered. Olson came to the District's office that same day and Klaus saw her entering the building as he was leaving. While at the office, Olson signed a memorandum stating:

> On February 5, 2007, the Eau Claire Area School Board authorized that Superintendent William Klaus begin accessing his early retirement stipend effective August 1, 2007.

Lubinsky Aff., dkt. #30, ex. 2 at 92. The memorandum was written on District letterhead, hand dated "2/5/07" and the signature block read, "Carol Olson, President." Olson, however, was not the Board president or even a Board member at the time she signed the memorandum and she signed it sometime in July 2007, not February 2007.

When Klaus returned to the District's office that day, he saw the signed memo, though he had no knowledge of how the memo was created. Klaus also knew the back-dated Olson memo would be given to Kling. After receiving the memo, Kling prepared some calculations in August 2007 for Klaus regarding his early retirement stipend.

Sometime in August or September 2007, the District's interim superintendent, James Leary, and then Board president, Michael O'Brien, were informed that Olson had signed a document stating the Board had agreed to permit Klaus to access his early retirement stipend once he stepped down as superintendent. Klaus attended the Board's agenda planning meeting on September 5, 2007. After the meeting, Leary asked Klaus what he remembered the Board agreeing to with regard to his early retirement stipend and Klaus told Leary his belief that he

7

was entitled to the stipend now.

Several board members emailed one another in October 2007 about Klaus receiving his stipend before he retired from the District, noting they had never agreed to such circumstances. That same month, then deputy superintendent, Gregg Butler, told Klaus that the Board had some concerns regarding Klaus receiving his early retirement stipend while still employed by the District.  Klaus responded that his real concern was with insuring that his wife and family obtained his stipend should something happen to him.

Later that same month, on October 24th, the Board and Klaus reached a compromise regarding Klaus's stipend and entered a new agreement, which stated:

- The Board agreed to the previously stated agreement that the retirement stipend for Dr. William Klaus will be determined based on his salary as a superintendent and not as a principal or other administrative position.

- The Board agreed that Dr. Klaus would be eligible to receive a retirement stipend at or after age 55 [a return to the original age].

- The Board agreed that after Dr. Klaus retires from the Eau Claire Area School District[,] his 60 equal payments will be based on his adjusted salary as a superintendent as used for state retirement calculations.

- The Board agreed that in the event of the untimely death of Dr. Klaus his heirs would have the rights of survivorship.

Lubinsky Aff., dkt. #30, ex. 2 at 86.

## III.   Klaus's Suspension

During November and December, the Board held several closed session meetings to discuss Klaus's actions with respect to his early retirement stipend.  Then, in April 2008, an

article was published in the Eau Claire Leader Telegram, a local newspaper, reporting on Olson's back-dated memo. After the article ran, the local District Attorney had the Eau Claire Police Department initiate an investigation into the memo.

That same month, Board members Trish Cummins and Carol Craig raised issues with the Board about Klaus's early retirement stipend and the circumstances surrounding Olson's memo. On April 21, 2008, Ms. Craig was elected president of the Board. After her election, the Board initiated an investigation into the circumstances surrounding the memo, including having several witnesses testify before it. Among those asked was Klaus, who provided initial testimony at a meeting on April 25, 2008. On April 29, 2008, the Board also questioned Ms. Iverson, the Board's secretary as well as Klaus's assistant in 2007, about the memo. Iverson assumed that she typed the memo, though she did not recall typing it. Iverson could not recall discussing with Ms. Olson what date to put on the memo, though Olson recalled Iverson telling her to back-date the document. Iverson and Klaus testified they had not discussed what date to place on the memo and Klaus denied directing anyone to have the memo back-dated.

During the investigation, one of the Board members, Mary Kneer,[4] initially was unable to recall whether the Board discussed providing Klaus with access to the early retirement stipend during his continued employment by the District. Kneer later reported remembering "more" about what the Board had discussed, but it appears the Board paid little particular attention to Kneer's statement because she never explained what "more" she was remembering. *See* Winston Aff., dkt. #42, ex.1 at 6-7, Kneer Dep. Tr., at 24, ln. 25 - 26, ln. 6.

---

[4] Ms. Kneer was a Board member with the District from 1994 to 2009.

In the summer of 2008, Klaus received notice that the Board would hold a meeting on July 28, 2008, to consider "whether [Klaus] should be placed on suspension without pay and, if so, for how long (pending possible further proceedings, if appropriate)." Lubinsky Aff., dkt. #30, ex. 2 at 90. The notice explained that at the meeting the Board would hear and consider information and evidence about nine allegations or issues involving Klaus. It also noted that Klaus could demand that the meeting be held in open session. Klaus was notified that at the meeting the Board could take action and suspend him, without pay, as a result of what it found. Finally, the meeting was to provide Klaus with an opportunity to be heard and explain the information and evidence regarding the charges brought against him, but it was "not a full evidentiary hearing." *Id.* at 91.

When Klaus arrived at the meeting with his counsel, they were handed a thick binder of materials. Klaus's attorney objected to not having received the materials sooner so that he could review, read and understand the materials that were there, but his objection was rejected. Klaus was permitted to testify to the Board and the Board to ask him questions. Klaus was also permitted to introduce evidence, such as the affidavits of Olson and Evans.

On August 8, 2008, the Board issued its "Findings, Conclusions and Order of Suspension." The Board found that eight of the nine charges lodged against Klaus were true and correct by unanimous consent or votes of 6-1 or 5-2. Klaus received a disciplinary suspension, without pay, from August 11, 2008, through June 15, 2009. At the end of the suspension, Klaus was to be transferred to an administrative position chosen by the superintendent. Although Klaus would not receive his salary, the District was to continue to provide him with contractual insurance benefits, including health, dental, disability and life

10

insurance.

In its findings, the Board explained the procedure provided to Klaus:

The Board of Education met with Dr. Klaus on April 25, 2008.  The Board also met with members of its executive administrative team on April 29, 2008. Thereafter, the Board of Education held a series of meetings to review and consider Board of Education policies, Board of Education minutes and proceedings, responses to public records requests and e-mail correspondence, related information from a separate police investigation, and District administrative contracts.

Thereafter, a second meeting was scheduled with Dr. William Klaus.  A meeting with Dr. Klaus was originally contemplated for July 7, 2008, but was postponed at the request of Dr. Klaus' legal counsel.  The meeting was subsequently rescheduled for July 17, 2008.  The meeting was again postponed to July 28, 2008, to allow for additional notice to Dr. Klaus of the charges to be considered by the Board of Education.  Those charges were formally issued on July 22, 2008.

The Board of Education met with Dr. Klaus and his legal counsel on July 28. The charges were reviewed with Dr. Klaus and he was provided with an opportunity to respond to each charge presented.  Dr. Klaus and his legal counsel were presented with information that had been assembled by the Board of Education during its inquiry, and informed of additional matters that the Board had taken notice of.  Dr. Klaus' legal counsel also encouraged the Board to ask questions of Dr. Klaus concerning the charges, and the Board considered Dr. Klaus' responses as well as his demeanor in evaluating those responses.

Lubinsky Aff., dkt. #30, ex. 2 at 93.

The same day the Board issued its findings and conclusions, Board member Kneer typed

up the following statement:

I want to go on record indicating that as current board discussions took place regarding Dr. Klaus' district retirement, I am recalling more about the discussions that took place in January/February 2007.

Winston Aff., dkt. #42, ex. 26.  Kneer gave the statement to somebody else on the Board,

possibly Ms. Craig, or the Board's attorney, Kirk Strang.  After providing the written statement,

Kneer was asked whether she was sure she wanted to submit the statement because if it got out

to the press it could harm Kneer, since she previously had said she could not recall specifics about those discussions.  Kneer took the statement back and did not submit it to the entire Board.

OPINION

I.   <u>Due Process</u>

A.   **Deprivation of property**

At the core of Klaus's claims against the District and members of its school board is the assertion that his due process rights were violated when he was suspended without pay for 10 months.  The Fourteenth Amendment of the Constitution provides that no State shall "deprive any person of life, liberty, or property without due process of law[.]"  The party asserting that his due process rights were violated must first prove that he was "deprived of a constitutionally protected interest in life, liberty or property."  *Belcher v. Norton*, 497 F.3d 742, 750 (7th Cir. 2007).

Klaus contends persuasively that loss of his salary for 10 months was the deprivation of a property interest and the defendants do not disagree.  While the Supreme Court has not had occasion to decide whether due process protections extend to discipline short of termination, *Gilbert v. Homar*, 520 U.S. 924, 929 (1997), the parties assume that the suspension without pay infringed a protected property interest and the court will move forward under that assumption.  *See Batagiannis v. West Lafayette Community School Corp.*, 454 F.3d 738, 741 (7th Cir. 2006) (court may accept the parties' assumption that plaintiff was entitled to some process without examining whether the assumption is justified).

12

Once a property interest is established, the next step is to determine what process is due. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985).  "An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Id.* at 542 (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)).  Due process, nonetheless, "is not a technical conception with a fixed content unrelated to time, place and circumstances"; instead, it "is flexible and calls for such procedural protections as the particular situation demands."  *Gilbert*, 520 U.S. at 930 (internal quotations omitted).

Defendants contend that the Seventh Circuit's decision in *Batagiannis* is dispositive as to the amount of process to which Klaus was entitled.  In *Batagiannis*, the plaintiff claimed due process entitled her to a hearing before a wholly neutral decision-maker, and not the school board, before her employment as the school district's superintendent could be terminated.  454 F.3d at 741.  The appellate court disagreed and explained that she had waived that entitlement when she signed her contract.  *Id.*  The court held that "Bataginnis received exactly what she had agreed to accept: a hearing *by the school board*.  That's what ¶5.b of her contract specified; by signing, she waived any entitlement to a wholly neutral decision-maker."  *Id.* (emphasis in original).  The appellate court further held that -- while the Supreme Court had held that a government cannot avoid providing a due process hearing by legislating such hearings out of existence -- "the Court has never doubted the ability of individual employees to waive entitlements or negotiate in advance the details of the hearings they will receive."  *Id.*

Plaintiff responds to these holdings in *Batagiannis* by asserting that his case is "factually distinguishable" and that *Batagiannis* is simply "not relevant."  While difficult to follow, these

13

assertions are premised on arguments that (1) the portion of his contract--¶5d--that provides him with the right to request a "meeting" before the full Board on the merits of any proposed discipline short of termination serves as an additional right above what due process requires, not as a waiver of any due process rights; and (2) a Board member, Ms. Kneer, never intended ¶5d to require that Klaus waive any rights.

Neither argument is persuasive.  Plaintiff's first argument fails as it contradicts the Seventh Circuit's essential holding that one may contract for less than what due process might otherwise require.  In other words, anytime someone agreed, as Klaus did, to specific process, he could then avoid that agreement simply by arguing that he was contracting for some right in addition to his due process guarantees.  Plaintiff's second argument fails because whatever a single Board member intended is essentially irrelevant to deciding to what Klaus contracted. The contract terms are unambiguous regarding what process Klaus was to receive before being subject to discipline by the Board: (1) a meeting before the full Board on the merits of the proposed discipline and (2) discipline that is neither arbitrary, nor capricious.  *See Borchardt v. Wilk,* 156 Wis. 2d 420, 427, 456 N.W.2d 653, 656 (Ct. App. 1990) ("Where the terms of a contract are plain and unambiguous, we will construe it as it stands.").[5]  The wisdom of deferring to straightforward terms in the contract is particularly well taken here, given that the old Board's members generally, and particularly Ms. Kneer, seem in disagreement about the contract's meaning.

_____

[5] In interpreting the contract, the court uses the law of the state that governs the parties' actions.  In absence of dispute over what law governs, the court will apply the law of the forum state, which in this case is Wisconsin.  *See FutureSource LLC v. Reuters Ltd.,* 312 F.3d 281, 283 (7th Cir. 2002).

This reading is further supported by the later portion of the contract providing Klaus with greater process, including a more in-depth hearing, if the Board was considering terminating him.  For example, to terminate Klaus the Board would have needed to provide him written notice of charges, give him an opportunity to request an impartial hearing and permit him to present testimony and engage in cross-examination at the hearing.  Agreeing to some lesser process for discipline short of termination is the most reasonable reading of the separate section of the contract dealing with process for punishment short of termination.  Requiring the same process in both circumstances would make the process under ¶5d superfluous.

Plaintiff contends that if he did contract for something less, defendants still failed to provide him that level of process because their decision to suspend him was arbitrary and capricious, which violates the contract.  Unfortunately for the plaintiff, all that is necessary to rise above an "arbitrary and capricious" standard under federal law is a decision that falls within the range of reasonable interpretation of the evidence.  *See, e.g., Green v. UPS Health & Welfare Package for Retired Empployees*, 595 F.3d 734, 739 (7th Cir. 2010) (in ERISA case plan administrator's decision was not arbitrary and capricious because it was "within the range of reasonable interpretations"); *Wetzler v. Ill. CPA Soc'y & Found. Retirement Income Plan*, 586 F.3d 1053, 1057 (7th Cir. 2009) ("Under [arbitrary and capricious] standard, an administrator's interpretation is given great deference and will not be disturbed if it is based on a reasonable interpretation of the plan's language."); *Mt. Sinai Hosp. Med. Ctr. v. Shalala*, 196 F.3d 703, 708 (7th Cir. 1999) ("While th[e arbitrary and capricious] standard does not mean no review at all, the Secretary's decision will be accorded a high degree of deference.  We will not find her action to be arbitrary or capricious as long as the agency's path may be reasonably discerned."

15

(Internal quotations and citations omitted)).  The Board's decision does not fall outside this lenient standard.

Klaus argues that the Board's findings in support of its decision to suspend him without pay, but with other benefits, for a year was made despite evidence that he had done nothing wrong.  He focuses on there having been four out of seven Board members who recalled discussing and agreeing, in closed session, to permit Klaus to access his early retirement stipend after he transferred from superintendent to principal but before he retired from being employed by the District.  Even accepting the premise that there are facts[6] to support this argument, the Board having knowledge of this fact would not make their decision arbitrary and capricious in light of the other information before it.

The Board had evidence that Klaus was involved with former Board president Olson in back-dating a memorandum.  Whether or not he actually typed the memorandum or wrote in the false date, it was undisputed that he knew that much of the information on the memorandum, such as the District letter head, Olson's title as president and the date, was misleading.  Even if Klaus was contractually entitled to the stipend, he submitted a memorandum to the then current Board that at best was misleading and at worst was an attempt at fraud.

---

[6] Klaus proposes that before the Board issued his suspension, Board member Kneer told the other members that she remembered the Board discussing and agreeing to provide Klaus with the early retirement stipend before he actually retired from being employed by the District.  *See* Pl.'s PFOF, dkt. #41, ¶152.  Kneer's deposition testimony does not support this fact.  She did not testify to telling other Board members what she remembered.  She actually testified that the Board would not have known much of anything about what she remembered until she provided a statement, which merely said that she remembered "more."  *See* Winston Aff., dkt. #42, ex. 1, Kneer Dep. at 25 lns. 12-25, and 26, lns. 1-6.

Regardless of what four former Board members recalled, Klaus's contract, by its own terms, is reasonably interpreted not to provide access to early retirement benefits until after Klaus retired from any employment by the District.  His contract permitted him to keep his superintendent retirement benefits even though he was transferring to and presumably would retire in a middle school principal position, but it did not say that he could access those benefits while he remained employed by the District as a principal.

On the contrary, his contract refers to recovering an "early retirement stipend" upon "district retirement."  The path the Board took in deciding to suspend Klaus may be reasonably discerned consistent with the information before it.  Accordingly, they did not act arbitrarily or capriciously in violation of the process Klaus was due under his contract.

Klaus also argues that because his contract does not mention the possibility of an "open" session meeting and the Board offered him such a meeting, the due process he was entitled to must derive from Wis. Stat. § 19.85(1).  Klaus's argument is simply incorrect.  First, he fails to point to any law holding that the offering of more process or procedures than were contracted for creates a *right* to additional process, much less that the offer entitled Klaus to due process rights beyond his contract.  Second, and more importantly, the open meetings law Klaus cites does not entitle him to an evidentiary hearing.  The statute does not entitle anyone to an evidentiary hearing.  Instead, it entitles public employees to "actual notice of any evidentiary hearing which may be held prior to final action being taken and of any meeting at which final action may be taken."  Wis. Stat. § 19.85(1)(b).  Thus, even if the statute somehow trumped the contract, Klaus received what the statute requires: notice of the July 28th meeting.

Even assuming that Klaus was entitled to more process than he contracted for (that is,

17

more than a meeting where he was told the reasons for the Board's possible disciplinary actions and an opportunity to respond), he received the process due under the circumstances. As stated earlier, the exact process due in a specific situation is flexible. *Gilbert*, 520 U.S. at 930. In Klaus' situation, clearly he was given notice and an opportunity to be heard and no reasonable jury could find otherwise. *See Pugel v. Bd. of Tr. of Univ. of Ill.*, 378 F.3d 659, 662 (7th Cir. 2004) ("The hallmarks of procedural due process are notice and an opportunity to be heard.").

There is no dispute that Klaus received notice of the nine charges being asserted against him before the July 28th meeting[7] before the Board. Klaus argues that he was not given a meaningful opportunity to be heard because he was not permitted to "present evidence, call witnesses, cross-examine witnesses or otherwise test the [Board's] evidence." Pl.'s Br., dkt. #40, at 14. Klaus makes this argument even though, as far as what is established in the record provided to the court, he did not at the time of the meeting object to the absence of those procedures. The only objection Klaus raised at the July 28th meeting was that his counsel and he were not given an opportunity prior to the meeting to examine a binder of materials the Board had created. That objection, however, is unsustainable because there is no constitutional right to discovery, which is what Klaus was asking for. *Batagiannis*, 454 F.3d at 742.

---

[7] The court follows the parties' lead and refers to what occurred on July 28th as a "meeting." The parties make much of the fact that Klaus received a meeting and not a hearing. Although this distinction is important in terms of what the administrator contract requires, in terms of the due process analysis it is a distinction without a difference. The process Klaus received does not depend on what the process was labeled, but on what procedures were used and followed. Thus, while Klaus did not receive a full-blown, trial-like evidentiary hearing, he received a lesser hearing or, if you will, a meeting. Regardless of what the process was called, the issue is whether the "meeting" provided him with a meaningful opportunity to present his side of the story, and it did.

Klaus also fails to explain why those additional procedures would have been necessary for him to have a meaningful opportunity to be heard.  First, Klaus was permitted to present at least some evidence, in the form of his testimony as well as affidavits from Board members Evans and Olson.  He was also questioned and permitted to respond to the charges brought against him.  In other words, he presented his side of the story.  Even now, Klaus does not explain what additional evidence or witnesses he would have proffered to better present his side; much less what was proffered at the time that the Board refused to consider.  Instead, Klaus seems to being seeking more process for the sake of process, not because more process may have changed the outcome.

Finally, according to Klaus the Board "factually knew" that most of the charges against him were false but still it decided to suspend him.  This statement undermines his argument that he needed more procedural protections to obtain a meaningful opportunity to be heard.  What Klaus really seems to be arguing in hindsight is that because the Board did not find in his favor, he did not receive due process.  Due process, however, does not entitle Klaus to a favorable result based on the information he presented to the Board; it entitles him only to a meaningful opportunity to present his side of the story.  *Pugel*, 378 F.3d at 666 ("Due process does not require decisionmakers to adopt the charged party's explanation.").  And that is what he received.

### B.    Deprivation of liberty

In addition to his claim that defendants denied him property without due process, Klaus claims that they denied him liberty without due process.  Specifically, Klaus alleges that the

Board's decision to suspend him for his involvement with the back-dated memorandum and his attempt to obtain his early retirement stipend while still employed by the District severely damages his good name and reputation depriving Klaus of his freedom to pursue his chosen occupation without due process. Because, as discussed *supra*, Klaus received all the process he was due, and no reasonable jury could find otherwise, his due process claim premised on the loss of a liberty interest suffers the same fate as his due process claim for loss of a property interest.

Klaus's liberty interest claim also fails for lack of any evidence from which a jury could reasonably find that the Board's actions -- including its decision to suspend him -- "make it virtually impossible for [him] to find new employment in his chosen field." *Bordelon v. Chicago Sch. Reform Bd. of Tr.*, 233 F.3d 524, 531 (7th Cir. 2000) (quotation omitted). The facts Klaus cites in support of the impossibility of new employment focus on the alleged harm his reputation has suffered in Eau Claire. *See* Pl.s PFOF, dkt. #41, ¶¶270-73. These facts rise from the opinions offered by Board member Kneer at her deposition. Kneer's opinions, however, have no foundation and appear based on mere speculation, which is not sufficient support to avoid summary judgment. *Harrington v. New England Mut. Life Ins. Co.*, 873 F.2d 166, 169 (7th Cir. 1989). Even accepting that Klaus's reputation has been injured in Eau Claire and that injury may make it hard for him to find a school administer position in Eau Claire, it does not make it "virtually impossible" for him to find a new job in his field.

Additionally, Klaus's re-employment by the District after his year suspension dooms his liberty interest claim. His employment for the 2009-2010 school year demonstrates that even after the Board's decision it was not merely possible for Klaus to find employment in his chosen

20

field, he was in fact employed in his field after the decision.  *See Bordelon*, 233 F.3d at 531 (despite the effects of the school board's actions on principal's professional reputation, his renewed employment by the school district defeated his liberty interest claim as a matter of law).  While the Board's suspension most likely will have some adverse effect on Klaus's job prospects, Klaus has failed to show that those adverse effects will make it virtually impossible to find new employment.  *Bordelon*, 233 F.3d at 531.  Accordingly, defendants are entitled to summary judgment on Klaus's due process liberty interest claim.

## II.   State Law Claims

### A.   Breach of Klaus's administrator contract

Klaus claims that defendants breached his administrator contract because the Board's decision to suspend him without pay for a year was arbitrary and capricious.  As already explained, no reasonable jury could find that the Board's decision was arbitrary and capricious based on all the information before the Board at the time.  Furthermore, while the Board's decision to suspend Klaus without pay for an entire school year was, in the court's view,[8] harsh, it is supported by the Board's specific findings that Klaus had attempted to commit an intentional fraud.

---

[8] Plaintiff's argument regarding the arbitrary and capricious nature of the Board's decision focuses on the Board's findings.  He does not explicitly argue that the discipline itself was unreasonably harsh or arbitrary and capricious, which waives the argument. *See, e.g., United States v. 5443 Suffield Terrace, Skokie, Ill.*, 607 F.3d 504, 509 (7th Cir. 2010) (arguments not properly raised at summary judgment considered waived).  Regardless of the waiver, the argument would fail because the Board's discipline is sufficiently supported in its findings.

The Board unanimously found that

1.  Dr. Klaus had the document dated February 5, 2007, created and/or was responsible for creating it, and then provided the document to District personnel for the purpose of securing or receiving retirement benefits.  In this regard:

    a.  The attached document was created using District staff, materials, and time.

    b.  The attached document was placed on District letterhead or paper that bears the logo or insignia of the District.

    c.  The attached document was prepared to be signed, and was signed by former Board President Carol Olson, although she was not Board President when the document was prepared or signed.

    d.  The attached document was backdated to reflect the same date that Dr. Klaus' administrator contract originally had been approved by the Board of Education (February 5, 2007), although it was created and signed during the summer of 2007.

    e.  The attached document was presented to District personnel to process Dr. Klaus' request for payment of retirement benefits, without disclosure to District Payroll personnel that the document had not been prepared on the date set forth in the document or by a current Board of Education President.

Lubinsky Aff., dkt. #30, ex. 2 at 94.  By a vote of 6-1 the Board also found:

3.  Dr. Klaus intended, knew, and/or should have known that the attached document would reasonably lead persons receiving it to believe that it had been prepared by a current Board of Education President on the date appearing on the document, and that it constituted an authorized statement of or on behalf of the District's Board of Education regarding Dr. Klaus' eligibility for retirement.

*Id.* at 95.  Finally, by a vote of 5-2, the Board found that:

6.  . . . In addition, Dr. Klaus did not reasonably believe that the Board of Education had authorized the payment of his retirement benefits effective August 1, 2007, before his actual retirement from District employment.

22

*Id.* Each of these findings is supported, if not compelled, by facts presented to the Board. The Board's findings as a whole paint a picture of Superintendent Klaus engaging in repeated, surreptitious changes to his contracts and ultimately deliberate deception in an attempt to induce the unjustified payment of early retirement benefits. Moreover, when this contract resulted in a very public, criminal investigation, the entire School District was embarrassed and its reputation injured. Such findings support the conclusion that the decision to suspend Klaus without pay for nine months, while heavy-handed, was not arbitrary or capricious. Defendants, therefore, are entitled to summary judgment on Klaus's claim for breach of his 2007-2009 administrator contract.

### B.   Defamation

Klaus's claim for defamation fails for the same reasons his claim that the Board acted arbitrarily and capriciously fails. As Klaus correctly notes, in order to find that defendants violated Klaus's common law rights to be free from defamation, he, as a public figure, must establish that the defamatory statements were made with "actual malice." *In re Storms*, 2008 WI 56, ¶38, 309 Wis. 2d 704, 722, 750 N.W.2d 739, 748. "[A]ctual malice requires that the allegedly defamatory statement be made with 'knowledge that it was false or with reckless disregard of whether it was false or not.'" *Id.* (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964)). If, as Klaus contends, the Board knew or should have known that its findings regarding Klaus's involvement with the back-dated memorandum and his attempt to obtain early retirement stipends before he retired from employment with the District, then the Board's decision to the contrary would have been unreasonable, or, in other words, arbitrary

and capricious.  Without becoming too repetitive, the Board's decision, however, was not arbitrary and capricious and no reasonable jury could find otherwise.

On the information the Board had before it, it knew or should have known that there was a disagreement among the Board members involved with the acceptance of Klaus's last administrator contract his access to an early retirement stipend.  Then, turning to the actual language of the contract, there is no language entitling Klaus to such access.  With respect to the back-dated memorandum, no one could remember who actually created the memo but it was undisputed that Klaus knew or at least should have known there was misleading information on the memo and still he proceeded to submit the document in support of his disputed request for access to an early retirement stipend.  Even assuming that the Board's findings were in fact untrue--an assumption far from certain--no reasonable jury could find that the Board knew or should have known them to be false.

### C.    Promissory estoppel

In denying Klaus's motion for declaratory and summary judgment, his 2009-2011 contract with the District was found to be void and unenforceable.  *See* dkt. #68.  Klaus contends that despite the unenforceability of the contract, he is entitled to relief under the quasi-contract theory of promissory estoppel.  Klaus seeks to hold defendants accountable for the Board's promise of longer term employment to Klaus as a superintendent in the form of multiple, two-year contracts instead of offering Klaus higher pay.  Klaus contends that even though the contract was void and unenforceable, defendants should not be free to avoid the unfair result that would occur if defendants were permitted to keep the benefits they received,

24

Klaus working for lesser pay, while removing the benefit Klaus was supposed to receive, long term job security.

Defendants, however, cannot be estopped from not performing their portion of a contract that is void and unenforceable under a state statute.  The promise to employ Klaus with multiple two-year contracts if binding would provide Klaus with a term of employment in contradiction to that permitted by Wis. Stat. § 118.24(1).  As the Wisconsin Supreme Court has explained:

> When the legislative will is expressed in peremptory terms of a statute it is paramount and absolute and cannot be varied or waived by the private conventions of the parties. . . .  It follows that the legal effects and consequences of the statutory limitation cannot be avoided by estoppel.

*Grams v. Melrose-Mindoro Joint Sch. Dist. No. 1*, 78 Wis. 2d 569, 578, 254 N.W.2d 730, 735 (1977) (internal citations omitted).  Simply put, Klaus cannot use the theory of promissory estoppel to obtain that which a statute expressly prohibits.  Accordingly, defendants are entitled to summary judgment on his promissory estoppel claim as well.

## ORDER

IT IS ORDERED that:

(1)     Defendants' motion for summary judgment (dkt. #29) is GRANTED.

(2)     The clerk of court is directed to enter judgment in favor of defendants in accordance with this order and the court's previous order (dkt. #68), granting defendants' request for summary judgment on plaintiff's claim for breach of the 2009-2011 administrator contract and on defendants' request for a judgment declaring that the 2009-2011 administrator contract is void and unenforceable.

Entered this 13th day of July, 2010.

BY THE COURT:
/s/
_____
WILLIAM M. CONLEY
District Judge